CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 2 6 2016

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DAVID LEE STULTZ, | ) | |
| | ) | Civil Action No. 7:13CV00589 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | Hon. Glen E. Conrad |
| COMMONWEATH OF VIRGINIA, | ) | Chief United States District Judge |
| DEPARTMENT OF MOTOR VEHICLES, et al, | ) | |
| Defendants. | ) | |

This case is presently before the court on the plaintiff's motion for partial summary judgment and the defendants' motion for summary judgment. For the reasons set forth below, the parties' motions will be granted in part and denied in part.

## Summary of the Facts

### I.   Stultz's employment with DMV

David Lee Stultz was employed as a law enforcement officer with the Virginia Department of Motor Vehicles ("DMV") from November 25, 2005 until he was terminated on April 16, 2013. From November 2010 to October 1, 2012, Stultz served as the Special Agent in Charge ("SAC") of the Appomattox Division of DMV Law Enforcement Services, which was headquartered at the DMV's Customer Service Center in Lynchburg (the "Lynchburg CSC"). While in that position, Stultz supervised a number of employees, including Assistant SAC Robert Supinger, Senior Special Agents Anastasia Wootten and Andrew Hicks, and Program Support Technician Jennifer Dawson. His chain of command included Donald Boswell, the Director of Law Enforcement Services; Joseph Hill, the Assistant Commissioner of DMV's Office of Enforcement and Compliance; and Richard Holcomb, the Commissioner of DMV.

The Appomattox Division was abolished effective October 1, 2012. From that point until his termination, Stultz managed the DMV's Vehicle Theft Enforcement Unit. While in that position, Stultz's chain of command included Thomas Penny, the Director of Field Operations; Hill; and Holcomb.

## II.    Concerns about Dawson

Upon being appointed to the SAC position, Stultz began to receive complaints regarding Dawson, who performed administrative functions for the Law Enforcement Services office in Lynchburg. The complaints increased after Stultz began working full-time at that office, and Stultz, himself, observed her unusual and erratic conduct. Such conduct included crying uncontrollably, lying on the floor, sitting in complete darkness, hiding under her desk, making remarks about possessing a concealed weapons permit, expressing fear that her stepson was trying to kill her, and making suicidal remarks.

Stultz relayed his concerns regarding Dawson's behavior to Boswell and Hill. Stultz "was told to keep it 'low key' and [he] was not allowed to implement progressive discipline beyond . . . verbal counseling [or] take any action responsive to the behavior [he] observed to include involving family support or mental health services." Docket No. 454-1 at 5, ¶ 23.

At Dawson's request, Boswell and Hill approved a series of office modifications in an effort to alleviate her safety concerns. They agreed to add a lock to the glass entry door to the office, and to install a push button at Dawson's desk that would allow her to unlock the door for people to enter. They also approved Dawson's request for a panic alarm and intercom system. Even after those modifications were made, Dawson continued to express fear for her personal

2

safety at work. With Boswell's approval, Stultz implemented a policy prohibiting DMV law enforcement officers from working alone with Dawson at the Lynchburg office.

## III.    Supinger's hotline complaint and Stultz's subsequent communications with the Police Benevolent Association and the Secretary of Transportation

On October 17, 2011, Supinger utilized the State Employee Fraud, Waste, and Abuse ("FWA") Hotline operated by the Division of State Internal Audit ("DSIA") to lodge an anonymous complaint regarding Dawson and the effect that her behavior was having on the Lynchburg Law Enforcement Services office.    Supinger emphasized that Dawson was exhibiting the traits of someone in need of professional services, that her behavior was damaging morale and productivity, and that other employees were afraid to be left in the office alone with her. At the conclusion of the complaint, Supinger pleaded for "help . . . before this gets any worse and one of us gets hurt." Docket No. 454-7 at 8. Supinger listed Stultz as Dawson's supervisor, and identified several employees affected by Dawson's conduct, including Supinger, Hicks, and Wootten.

Supinger's complaint was assigned Case Number 12650.    DSIA forwarded the anonymous complaint to DMV's Internal Audit division ("Internal Audit"). James Womack, the Director of Internal Audit, assigned the complaint to Cheryl Sanders. Both Womack and Sanders were employed under Assistant Commissioner Hill's chain of command.

On or about November 28, 2011, Sanders contacted Stultz regarding the anonymous complaint and conducted an interview by telephone. She was assisted by another internal auditor in her office. During the interview, Sanders inquired about Dawson's behavior in the workplace. Stultz shared the concerns that Dawson had expressed regarding her safety, including Dawson's fear that her stepson was trying to kill her. Stultz described the actions that had been taken in an

3

effort to alleviate Dawson's safety concerns. He also discussed the impact that Dawson's behavior was having on her coworkers. Additionally, Stultz indicated that he was afraid that Dawson may commit suicide.

Stultz advised Sanders that he would gather additional information to respond to all of her inquiries. On November 30, 2011, Stultz emailed Sanders a chronological list of events involving Dawson, along with other documents supporting his concerns.

Stultz also provided Sanders with the names of additional employees with first-hand knowledge of Dawson's behavior, including Supinger, Wootten, Hicks, and Betty Jenson. However, none of those employees were interviewed by Sanders. Instead, the only other person that she talked to was Hill.

An interview narrative was prepared following Stultz's interview. The original version of the interview narrative included the information that Stultz had shared regarding Dawson's stepson and her fear that he might harm her. Although the DMV Internal Audit Office Policy and Procedures Manual expressly provides that an interviewee's responses should be recorded verbatim, Womack directed Sanders to alter the interview narrative to remove any references to Dawson expressing fear for her safety. Stultz's statements to the internal auditors that Dawson was "afraid for her life," that "she would be fine today and laying in the floor tomorrow," and that she had "a meltdown on Monday, November 21, 2011 when she was scared for her life" were changed to state that Dawson "was having some personal family issues" and that those issues had "caused her to act disruptively while at work." Docket No. 454-76 at 14, 16.

On January 20, 2012, Womack sent DSIA a final report regarding Supinger's FWA complaint. The report indicated that Supinger's allegations were "unsubstantiated" and that there

4

was "no evidence that [Dawson had] placed co-workers at risk of physical harm . . . [or was] destroying morale and damaging productivity." Docket No. 454-76 at 4-5. In a subsequent deposition, Sanders acknowledged that while the report included the finding that Dawson posed no risk of harm, the investigation by Internal Audit did not actually "look at anything in reference to the mental stability of Ms. Dawson or any safety risk she posed." Docket No. 454-15 at 13.

In March of 2012, Stultz obtained a copy of the final report through a Freedom of Information Act ("FOIA") request. Upon receiving the report, Stultz discovered that it included no mention of his concerns regarding Dawson's safety and the safety of others in the workplace, and yet contained a specific finding that Dawson posed no risk of harm.

Stultz subsequently communicated with Tim Sadler with DSIA. Based on the information gained from those communications and his review of the file for Case No. 12650, Stultz determined that the FWA program "was susceptible to manipulation and had in fact been corrupted" by DMV officials. Docket No. 454-1 at 10. The safety concerns identified by Stultz had not been investigated by DMV's internal auditors and instead had been "sanitized from the summary of the investigation report" submitted to DSIA. Id. Although Stultz was told that the FWA program does not typically cover workplace safety issues, the FWA complaint was closed as "unsubstantiated," with the specific finding made that Dawson posed no risk of harm to others. Docket No. 454-76 at 5.

In May of 2012, on his own time and using his personal phone, Stultz contacted Sean McGowan, the Executive Director of the Virginia Police Benevolent Association ("PBA"), and shared his concerns regarding the possibility that the FWA investigation had been fraudulently

5

manipulated. McGowan agreed to help Stultz gain access to Sean Connaughton, the Secretary of Transportation.

On May 31, 2012, Stultz began communications with Connaughton and his executive assistant, Georgia Esposito. Stultz sent McGowan an email from his personal email account that was immediately forwarded to Connaughton's attention. In the email, the subject of which was "Governor Hotline (Fraud, Waste and Abuse)," Stultz shared his concerns regarding the manner in which the anonymous complaint had been handled by DMV's internal auditors. Stultz indicated that the auditors had sanitized the final report submitted to DSIA, and that the information that he had shared during his interview and in follow-up communications regarding Dawson's behavior had been omitted from the final report. Stultz described the investigation as "fraudulent," and emphasized that "it kept the situation [with Dawson] from being handled at that time." Docket No. 454-2 at 50-51.

Stultz forwarded Connaughton a copy of the redacted version of the final report that he had received in response to his FOIA request. McGowan advised Stultz via email that he had spoken with the Secretary's office, and that "[t]he document [was] being taken very seriously." Docket No 454-2 at 53. McGowan also noted that the Secretary's office may soon request additional information.

Connaughton's office subsequently inquired as to whether Stultz could provide a non-redacted version of the final report. Stultz advised that he did not have access to a non-redacted version, but that he could attempt to provide the redacted information, which included Dawson's identity.

6

On June 4, 2012, after filling in the redacted spaces in the final report, Stultz sent Connaughton another email through McGowan. In the email, Stultz noted that it was "unbelievable the emails [he] sent DMV Internal Audit," which were "discounted . . . in their final summary." Docket No. 454-2 at 57.

On June 5, 2012, Esposito forwarded Stultz's communications to Holcomb, who then shared them with Jeannie Thorpe, DMV's Director of Human Resources.

## IV.  Supinger's transfer

On March 16, 2012, Boswell traveled to Lynchburg to announce that Supinger was being transferred to DMV's office in Waynesboro. Although Supinger and his wife, who is Asian, had worked in the same office for ten years, Boswell cited DMV's anti-nepotism police as one of the bases for the decision. Supinger opposed the reassignment, as did Stultz. See, e.g., Docket No. 466-64 at 6 (Thorpe Dep.) (acknowledging that Stultz "oppose[d] this new work assignment . . . [f]rom the very beginning"). Stultz advised Boswell that he did not think the decision was "fair" and that the decision should be reconsidered. Docket No. 466-70 at 7.

Supinger utilized the state employee grievance procedure to file a grievance regarding the transfer decision. Stultz was the "first step respondent" in the grievance process. Docket No. 466-70. Upon reviewing Supinger's grievance, Stultz proposed a compromise that would have permitted Supinger to remain in the Appomattox Division.

Supinger subsequently filed a charge of discrimination with the EEOC, which was based, in part, on his belief that he was being discriminated against due to his wife's nationality. Supinger has since filed an employment discrimination action against DMV, which is currently

7

pending in this district.  See Supinger v. Commonwealth, No. 6:15CV00017 (W.D. Va. 2015) (Moon, J.)

## V.     Reorganization of DMV Law Enforcement Services

On June 27, 2012, Hill announced that DMV would be reorganizing the Law Enforcement Services divisions and that Stultz's division would be abolished effective October 1, 2012.   Under the reorganization plan, the Law Enforcement Services divisions, which had been aligned with the Virginia State Police division boundaries, would be reorganized into eight districts.

Stultz and other law enforcement officers expressed concerns regarding the effect that the reorganization would have on the officers' ability to properly utilize the Virginia State Police's Statewide Agencies Radio System ("STARS").   Based on his experience as DMV's STARS representative and communications that he received from Virginia State Police officials, Stultz believed that disparities between an agency's operational boundaries and the Virginia State Police field division boundaries could hinder or delay emergency responses and place officers and the public at a risk of harm.

Prior to the reorganization taking effect, Stultz expressed his concerns to a number of DMV officials, including Boswell, Hill, and Holcomb.   DMV nonetheless moved forward with the reorganization on October 1, 2012.

## VI.    Stultz's communications with Senator Deeds

On October 1, 2012, Stultz contacted Virginia State Senator Creigh Deeds using his personal phone and email account, and made an appointment to meet with him.   On October 12, 2012, Stultz and several other DMV law enforcement officers met with Senator Deeds on their

8

own time, using a personal vehicle. During the meeting, Stultz expressed concerns regarding the safety issues that could result from DMV's decision to abandon the STARS divisions utilized by the Virginia State Police. Stultz explained the STARS system to Deeds and provided documents that supported his safety concerns.

On January 4, 2013, Senator Deeds proposed legislation that would have directed "the Joint Legislative Audit and Review Commission to study reorganizing all state law-enforcement agencies under the Virginia State Police." Docket No. 454-8. Stultz supported the legislation.

## VII. The Wootten-Dawson incident and subsequent investigation

Dawson was placed on administrative leave from March 2012 through May 2012. When Dawson returned, Hill transferred her from Law Enforcement Services to the DMV's External Audit division, and assigned her to an office in another part of the Lynchburg CSC. Wootten and other employees in the Law Enforcement Services division were instructed not to interact with Dawson. See Docket No. 428-2 at 33.

On September 13, 2012, Wootten encountered Dawson inside a small women's bathroom at the Lynchburg CSC. There is a dispute as to what occurred next. Wootten claimed that Dawson aggressively bumped her in her shoulder while Dawson denied any significant touching.

Immediately following the incident, Wootten advised Stultz that Dawson had "just assaulted [her]," and that Dawson "should be charged." Docket No. 428-6 at 69. When Stultz informed Boswell of the alleged assault and battery, Boswell advised Stultz that he "d[id]n't want [Stultz] investigating" the incident, and that it would be handled by Human Resources. Docket No. 428-2 at 52. Stultz "was instructed to tell [Wootten] to hold tight," and that someone from Human Resources was "going to be contacting [her] about this." Docket No. 428-2 at 56.

9

On September 14, 2012, Supinger accompanied Wootten to the office of a state magistrate. Wootten swore out a warrant for Dawson's arrest, which was executed shortly thereafter.

Upon learning of the incident involving Wootten and Dawson, DMV officials asked Thomas Penny, the Director of Field Operations, to conduct an investigation. As part of his investigation, Penny interviewed approximately fourteen individuals, including Stultz, Supinger, Wootten, and Hicks.

On December 7, 2012, Penny issued Hill an internal memorandum containing an "executive summary" of his investigation. In the memorandum, Penny reported that he was "unable to substantiate Wootten's claim that there was actual physical contact amounting to a battery." Docket No. 428-3 at 1. Penny went on to conclude that the incident, even as described by Wootten, did not rise to the level of workplace violence, and that there was insufficient evidence to suggest that Dawson's presence posed a threat to the safety of her coworkers or the public. Penny also provided a list of "additional issues" identified during the course of his investigation that warranted further review, including "whether or not law enforcement personnel colluded in unfairly prosecuting [Dawson] for reasons other than the belief that she actually committed a crime"; and "whether or not information about [Wootten's] efforts to secure a warrant for [Dawson] was purposely withheld from HQ by Appomattox management to prevent intervention in her arrest." Docket No. 428-3 at 2.

On December 17, 2012, Penny issued Thorpe an internal memorandum containing his "investigative summary." Docket No. 428-3 at 4. The December 17, 2012 memorandum addressed the same topics with greater factual detail and reached the same conclusions. Penny ended both memoranda by noting that Dawson was scheduled to be tried on the criminal charge on

10

January 29, 2013, and requesting the opportunity to attend the trial and assess whether the witnesses testified in a manner consistent with their interviews.

Dawson was ultimately acquitted following a bench trial on January 29, 2013. Thereafter, the DMV resumed Penny's investigation into what had been going on in the Appomattox Division and whether Wootten, Supinger, or Stultz had engaged in misconduct.

## VIII. Disciplinary actions

On March 5, 2013, Penny and Hill went to Stultz's office and delivered a letter of suspension. They took Stultz's badge, ID, firearm, computer, and keys, and told him that he had to leave the premises. According to Stultz, Penny advised him that "'[t]he situation was manageable until [Stultz] went outside the department to other government officials, especially going to the Transportation Secretary,'" and that they "[u]nfortunately [had] to handle things this way.'" Docket No. 454-1 at 23. Hill was present when the statements were made by Penny and did not dispute their accuracy.

On March 6, 2013, Hill issued Stultz a lengthy letter detailing alleged misconduct "for which [he] may be subject to disciplinary action." See Docket No. 454-32 at 2. The letter contained multiple allegations, including the following: (1) that Stultz and his subordinates "appear[ed] to have intentionally abused or recklessly used [their] police powers to arrest – under color of DMV authority – a coworker for assault and battery under questionable circumstances . . . which ultimately led to an acquittal of all charges"; and (2) that Stultz allowed his subordinates to have Dawson arrested for assault and battery even though Stultz "had expressly been told to take no immediate action," and even though he was "aware of [a] conflict between [himself, Wootten, Supinger, and Dawson]." Id. at 2-3. Hill observed that Boswell, after learning of the alleged

11

assault and battery, specifically instructed Stultz to not investigate the incident and "to tell Wootten to 'hold tight,'" and that, instead of heeding Boswell's instructions, Stultz had Supinger investigate the matter and sent Supinger to accompany Wootten in pursuing a criminal prosecution. Id. at 4. Hill emphasized that "[a]ssigning anyone to investigate the case was a violation of a direct order," and that "[a]ssigning it to someone from the Lynchburg office – particularly an individual who [Stultz] knew or should have known had significant issues with PST Dawson – appear[ed] to exhibit poor judgment and did not appear to comport with [Stultz's] sworn oath to 'impartially discharge' all duties incumbent upon [him]." Id. at 3. Hill further emphasized that Stultz's "actions in clearing SSA Wootten and ASAC Supinger to proceed to the Commonwealth's Attorney were in direct contradiction to the order to have her 'hold tight.'" Id. at 4.

At the conclusion of the March 6, 2013 letter, Hill advised Stultz that he would be placed on "pre-disciplinary leave until a determination is made in this matter," and that he had the right to respond to the allegations set forth in the letter. Id. at 141. Hill indicated that a written response should be sent to him no later than 5:00 p.m. on March 13, 2013, and that the response "should specify whether [Stultz was] electing to proceed under the Commonwealth of Virginia Grievance Procedure [Va. Code §§ 2.2-3000 to 2.2-3008] or the Law-Enforcement Officers Procedural Guarantee Act [Va. Code §§ 9.1-500 to 9.1-507]." Id. These statutes are referred to herein as the VGP and LEOPGA, respectively.

On March 29, 2013, Stultz commenced a grievance proceeding under the VGP regarding his suspension by submitting VGP Grievance Form A. Docket No. 454-33 at 3. At that time, Stultz had not been terminated.

12

Stultz's counsel requested and received an extension of time to respond to Hill's March 6, 2013 letter. He responded by letter dated April 2, 2013. See Docket No. 454-34 at 2. At the conclusion of the letter, counsel noted that "[s]ince the Department of Motor Vehicles has not adopted a specific policy in reference to proceeding under the [LEOPGA,] an informed decision cannot be made as to an appropriate election." Id. at 18.

On April 16, 2013, Stultz was terminated. Hill issued three Written Notices setting forth the grounds for Stultz's termination. The first Written Notice detailed four instances of alleged misconduct stemming from the incident involving Wootten and Dawson on September 13, 2012. See Docket No. 428-2 at 161. Hill cited to Stultz's alleged failure to follow Boswell's instructions to not investigate the incident and to tell Wootten to "hold tight." Id. (internal quotation marks omitted). Hill also cited to Stultz's alleged failure to keep upper management informed of issues that arose within his assigned division. As a final matter, Hill noted that DMV had "significant concern regarding [Stultz's] credibility, . . . in particular the manner in which [he] described the circumstances surrounding Wootten's trip to the Commonwealth's Attorney's office." Id. at 163-64. Hill emphasized that "[c]redibility is paramount in law enforcement and an essential function of the job," and that Stultz's "failure to be truthful in the course of the investigation demonstrate[d] a lack of integrity in [his] role as a sworn officer." Id. at 164.

Hill issued two additional Written Notices containing allegations of misconduct discovered "[i]in the course of investigating the issues surrounding the September 2012 arrest incident." Docket No. 459-6 at 11, 15. One of the Written Notices alleged that Stultz "demonstrate[d] abuse of authority, lack of objectivity, and extremely poor judgment" by advising Supinger that he intended to give him an Extraordinary Contributor rating on an evaluation "[d]espite being told by

13

[Boswell, Stultz's supervisor] that an Extraordinary Contributor rating was unwarranted." Id. at 15. The other Written Notice alleged that Stultz engaged in "serious misconduct" when he "obtained a copy of a report from the Fraud, Waste, and Abuse Hotline via a FOIA request," filled in the information that had been redacted to maintain anonymity, and "sent the report, with [the] additions, to a third party outside of the DMV." Id. at 11.

Wootten and Supinger were also suspended in March of 2013. Like Stultz, they were then terminated in April 2013.

## IX. Procedural wrangling

The Virginia Attorney General appointed Karen Michael as special counsel to represent DMV during the course of the administrative proceedings arising from the disciplinary actions taken against Stultz, Wootten, and Supinger. On April 17, 2013, Stultz, Wootten, and Supinger petitioned the Richmond City Circuit Court to enjoin Michael's appointment as special counsel. The Commonwealth demurred and moved to dismiss the petition.

On April 26, 2013, Michael contacted Christopher Grab, the Director of the Office of Employment Dispute Resolution ("EDR"), and sought on DMV's behalf "an immediate Order by EDR to stay all proceedings as it relates to any current, pending and/or future grievances that may be filed by Grievant." Docket No. 454-38 at 2. Michael noted that Stultz had recently been issued Written Notices that resulted in his termination, and that a separate grievance stemming from the termination could be forthcoming. She requested that the stay remain in place until the lawsuit seeking to remove her as special counsel was resolved.

On April 27, 2013, Grab contacted Stultz's counsel and asked that he respond to Michael's request. In response, Stultz's counsel agreed that the requested stay was appropriate. Counsel,

14

emphasized, however, that such agreement was "contingent upon sufficient protection being given to protect [Stultz] from any prejudice in reference to the implementation of the stay." Docket No. 454-40 at 2. Counsel requested that "the order reflect that it relates to any current, pending, and/or future grievance that may be filed by the grievant," including "any obligation on behalf of the grievant to provide or file his grievance based on the termination from employment which occurred on April 16, 2013." Id. Stultz's counsel also requested that "the time for filing of [a] grievance based on termination . . . be tolled during the pendency of the stay." Id.

Grab responded on May 1, 2013. Grab advised that EDR was "reluctant to order a general stay of all . . . pending and future grievance matters without knowledge of what issues could arise or are currently active." Docket No. 454-41 at 2. Nonetheless, Grab noted that "the parties may choose to agree to any stays, holds, or extensions as to particular non-court-related grievance matters between themselves." Id. Grab advised that EDR was of the belief that DMV and Stultz had "effectively agreed to an extension of the 30 calendar-day period for filing . . . a dismissal grievance." Id. Therefore, Grab noted that although Stultz was not precluded from filing a grievance regarding his termination at that time, he could so "after the disposition of the recently filed action in the Richmond City Circuit Court." Id. Grab explained that the time for filing such grievance would be "considered tolled during the pendency of [that] action." Id.

After receiving additional responses from counsel, Grab sent counsel for DMV, Stultz, Supinger, and Wootten another letter on May 3, 2013. Grab noted that "[t]o the extent there is any confusion, in the absence of any further agreement between the parties, the Office of Employment Dispute Resolution (EDR) considers the filing timeframe for dismissal grievances in

15

these matters tolled during the pendency of the Richmond City Circuit Court action." Docket No. 454-44 at 2.

On June 18, 2013, the Richmond City Circuit Court conducted a hearing on the grievants' petition. During the hearing, the Circuit Court orally ordered that any termination grievance proceedings would be stayed pending the Court's ruling on the petition to remove Michael as special counsel. The Court entered a written order memorializing the stay on June 27, 2013. See Docket No. 454-46 at 3 ("The Court Orders that only those matters related to the termination grievance now be stayed pending the Court's ruling on the Petition."). On October 21, 2013, the Circuit Court dismissed the petition with prejudice, effectively dissolving the stay of any proceedings regarding a termination grievance.

## IX.  Stultz's efforts to grieve his termination

On October 25, 2013, four days after the stay was lifted, Stultz filed a termination grievance under the LEOPGA. Stultz forwarded the grievance to Holcomb. See Docket No. 454-49 at 3 ("Enclosed is my grievance that is being filed with you, as the agency head of the Virginia Department of Motor Vehicles, pursuant to . . . [t]he Law Enforcement Officer Procedural Guarantee Act . . . , requesting a hearing to grieve my improper termination as Special Agent in Charge of the law enforcement division."). Additionally, "to fulfill any procedural requirements," Stultz provided a copy to Grab. Id.

On October 29, 2013, Michael denied Stultz's request for a grievance hearing under the LEOPGA, stating that DMV had "determined that Mr. Stultz may not proceed as requested." Docket No. 454-50 at 2. In refusing to grant Stultz a hearing under the LEOPGA, DMV first claimed that Stultz had "already elected to proceed under the Commonwealth's Grievance

16

Procedure." Id. DMV's letter ignored the fact that Stultz's March 29, 2013 grievance form electing the VGP related to his suspension as opposed to his termination, and that Stultz had not filed "a fully completed Grievance Form A – Dismissal Grievance," as required to pursue a termination grievance under the VGP. Docket No. 454-51 at 11.

DMV also claimed that Stultz's October 25, 2013 request for a hearing was not made "within a reasonable amount of time" as required by the LEOPGA, since a period in excess of six months had passed since Stultz was terminated. Va. Code § 9.1-504(A). DMV disregarded the prior stay on any termination grievance proceedings instituted by the Richmond Circuit Court, as well as the stay issued by EDR that was based upon the parties' agreement.

Stultz's counsel raised these points in a November 1, 2013 letter to Holcomb. In the letter, Stultz reiterated his demand for a hearing under the LEOPGA. See Docket No. 454-53. On November 18, 2013, Stultz's counsel sent Holcomb another letter in which he emphasized that DMV had failed to comply with Stultz's statutory rights and asked that Stultz be reinstated to his previous position.

Michael responded on behalf of DMV on November 20, 2013. Michael once again asserted that Stultz had "failed to request a hearing within a reasonable amount of time" and thus was "not entitled to a hearing under the Law Enforcement Officers Procedural Guarantee Act." Docket No. 454-59 at 2. Michael also continued to insist that Stultz, "by his actions and representations," had "clearly indicated his intention to proceed under the State Grievance Procedure." Id. Michael once again disregarded the fact that Stultz had never submitted the grievance form required to pursue a termination grievance under the VGP.

17

On May 2, 2014, after the Virginia Supreme Court denied the appeal from the decision by the Richmond Circuit Court, Michael wrote to Grab and requested that EDR "immediately lift the stay on all dismissal grievances, and order that the Grievants are permitted that amount of time to file their dismissal grievances that they had as of the date that the stay was first implemented." Docket No. 454-64 at 2. Stultz's counsel responded by letter dated May 5, 2014. In the letter, counsel reminded Grab that Stultz had already requested a grievance hearing under the LEOPGA. Counsel noted that "since the grievant has elected for his dismissal grievance to proceed under a process outside of the Office of Employment Dispute Resolution, no further action is required on [EDR's] part regarding his termination." Docket No. 454-65 at 3.

Grab issued a letter to counsel for DMV and Stultz the following day. Grab acknowledged that Stultz had elected to grieve his termination under the process provided by the LEOPGA. Consequently, Grab found that Michael's request to lift the stay was "moot," since Stultz was "not pursuing and [was] no longer able to pursue a dismissal grievance under the [VGP]." Docket No. 454-66 at 3 (emphasis added). Accordingly, Grab noted that "[t]his would appear to conclude EDR's involvement in this matter." Id.

On June 23, 2014, Stultz attempted one last time to gain his reinstatement as a DMV law enforcement officer by writing to Holcomb. Holcomb did not respond to Stultz's letter.

## X. Stultz's efforts to obtain new employment

Following his April 2013 termination from DMV, Stultz applied for a number of positions in the law enforcement field. The positions for which he applied required extensive background checks.

18

Counsel for Stultz and DMV engaged in discussions regarding the information in Stultz's personnel file. In October 2013, counsel for DMV contacted Stultz's counsel after receiving a request for information from the Roanoke County Police Department. In response, Stultz's counsel stated as follows:

> As you know, it has been both my position and my client's position that the bas[es] for the termination of Mr. Stultz in this case are unsupported by the facts and evidence. It is our position that the written statements and termination notices are based on false, misleading and inaccurate information. As such, it would be our position that the release of any basis for the termination would constitute defamation per se.
>
> We, of course, are in agreement that any factual information in Mr. Stultz's file, including the fact that he was terminated, would be appropriate to be released. However, we want to emphasize that since it is our position that the basis for the termination is inaccurate and false it would be our position that it would constitute defamation if it is in fact forwarded to a third party outside of DMV. As you know, this matter remains in litigation and it is the grievan[t's] position that he will be exonerated from all charges. As part of that request, he will be seeking that all negative inferences or matters be removed from his personnel file.

Docket No. 177-14 at 3. After receiving this response, DMV's counsel advised that "DMV will be notifying the Roanoke County Police Department early next week that it cannot provide any information other than that [Stultz] was an employee of DMV and his former salary." Docket No. 177-15 at 4.

Stultz subsequently applied for a position with the Bedford County Sheriff's Office ("Bedford County"). He was conditionally offered a position pending the completion of a background investigation. As part of the application process, Stultz was required to sign an Authority for Release of Information ("Release"), which authorized Bedford County to obtain employment information, and released any individual, including records custodians, from all

19

liability for damages that might result from compliance with the Release. Stultz signed the Release on February 28, 2014. See Docket No. 177-17 at 3.

On March 18, 2014, counsel for DMV contacted Stultz's counsel and advised that DMV had received a request for information from Bedford County, and that the request specifically pertained to information regarding Stultz's termination from DMV. Given the concerns previously expressed by Stultz's counsel, counsel for the DMV inquired as to whether the signing of the Release was indicative of "a change in position on the release on such information from October, 2013." Id. at 2. DMV's counsel advised that unless he heard otherwise, DMV would be providing the information requested by Bedford County.

Stultz's counsel responded by email on March 28, 2014. In the email, Stultz's counsel acknowledged that Stultz had signed the Release. However, Stultz's counsel asked that DMV "[p]lease understand . . . that it would be our belief that DMV would only be releasing information that they believe is true and accurate and can ultimately be supported by them." Docket No. 177-19. DMV's counsel acknowledged receipt of the email that same day. He then shared the concerns expressed by Stultz's counsel with Jeannie Thorpe. See Docket No. 466-115 at 4 (Thorpe Dep.) ("I can remember Eric Fiske [of the Attorney General's Office] and I talking about that concern.").

Thorpe subsequently forwarded Stultz's entire personnel file, including the Written Notices issued in support of his termination, to Bedford County. After receiving the Written Notices in April 2014, Bedford County declined to hire Stultz. In light of certain "additional information" included in the Written Notices, Lieutenant Michael Harmony, who was involved in the hiring decision, decided that Stultz was "out." Docket No. 466-112 at 3. The "additional

information" included the allegation that Stultz "communicated with the ASAC [Supinger] that he would give him an extraordinary contributor [EC] rating before showing it to the reviewer and he disregarded his supervisor's instructions not to give an EC rating." Id.

By the time that Thorpe forwarded the Written Notices to Bedford County, Stultz had established, during the course of proceedings before the Virginia Employment Commission ("VEC"), that this particular allegation was false. During the VEC proceedings, Stultz produced an email from Boswell, the relevant supervisor, expressing his approval of the EC rating for Supinger. See Docket No. 466-118 at 12 ("David, That's fine. I have changed the PE with my reason in my comment section. I am mailing it to you at the Lynchburg CSC. Thanks, Don."). Stultz was ultimately awarded unemployment benefits following a successful appeal to the Circuit Court for the City of Lynchburg.

## Procedural History

Stultz filed the instant action on December 10, 2013. In his original complaint, Stultz alleged that he was terminated by the DMV in retaliation for opposing acts of discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

On December 12, 2014, Stultz filed an amended complaint, which added the Commonwealth of Virginia and multiple individuals as defendants, and asserted additional claims under federal and state law. The new individual defendants named in the amended complaint included Richard Holcomb, individually and in his capacity as Commissioner of DMV; Joseph Hill, individually and in his capacity as Assistant Commissioner; Jeannie Thorpe, individually and her official capacity as Human Resources Director; William Anderson, individually and in his official capacity as Employee Relations Manager; Thomas Penny, individually and in his official

21

capacity as Director of Field Operations; Ronna Howard, individually and in her official capacity as Legal Analyst; and Donald Boswell, individually and in his capacity as Director of Law Enforcement Services.[1]

The amended complaint asserted the following claims: denial of due process in violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (Count I); retaliation in violation of Title VII (Count II); retaliation in violation of the First Amendment under § 1983 (Count III); supervisory liability under § 1983 (Count IV); violation of the Driver's Privacy Protection Act ("DPPA") (Count V); tortious interference with contract expectancy (Count VI); and computer invasion of privacy (Count VII).

The defendants moved to dismiss the amended complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On August 5, 2015, the motion was granted in part and denied in part. The court dismissed the portion of Count I in which Stultz alleged that certain defendants denied him due process by interrogating him without advising him that he was under investigation. The court also dismissed the DPPA claim and the claim for computer invasion of privacy.

Following the completion of discovery, the parties filed cross-motions for summary judgment. The court held a hearing on the motions on August 10, 2016. The motions have been fully briefed and are ripe for review.[2]

---

[1] Stultz also named as defendants Sean Connaughton, individually and in his official capacity as the former Secretary of Transportation; Georgia Esposito, individually and in her official capacity as the Executive Assistant to the Secretary of Transportation; and Aubrey Layne, in his official capacity as the current Secretary of Transportation. The claims against Layne were dismissed by the court on August 5, 2015. The claims against Connaughton and Esposito have since been voluntarily dismissed by the plaintiff.

[2] Prior to the summary judgment hearing, the defendants moved to strike the plaintiff's brief in opposition to their motion. The plaintiff has since moved to strike the affidavits submitted in support of the defendants' motion. The parties' motions to strike will be denied.

22

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "When faced with cross-motions for summary judgment, [courts] consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, 475 F.3d 633, 636-37 (4th Cir. 2007). "The court must deny both motions if it finds that there is a genuine dispute of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." Sky Angel U.S., LLC v. Discovery Commc'ns., LLC, 95 F. Supp. 3d 860, 869 (D. Md. 2015) (internal citation and quotation marks omitted).

## Discussion

### I.     Claims under § 1983

Stultz asserts a number of claims under 42 U.S.C. § 1983, which imposes civil liability on any person acting under color of state law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. Specifically, Stultz claims that certain defendants violated his Fourteenth Amendment right to due process and his First Amendment right to free speech.

23

## A. Due process violations

The due process clause of the Fourteenth Amendment provides that "no state shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1. "[I]n order to claim entitlement to the protections of the due process clause -- either substantive or procedural -- a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988) (citation omitted). If the plaintiff makes such showing, the court considers what process was required and whether any provided was adequate in the particular factual context. Id.

### 1. Denial of post-termination hearing

In the first due process claim set forth in Count I of the amended complaint, Stultz asserts that Holcomb, Hill, Thorpe, and Penny deprived him of due process by denying his request for a post-termination hearing. See Docket No. 152 at 55. The defendants concede that Stultz "was vested with a constitutionally protected property interest in continued employment." Docket No. 429 at 20. Additionally, the parties agree that "all the process that is due is provided by a pretermination opportunity to respond [which Stultz received], coupled with post-termination administrative procedures as provided by . . . statute." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 547-48 (1985). The sole issue in dispute is whether the defendants deprived Stultz of

24

due process by denying his requests for a hearing under the LEOPGA.[3] Both parties have moved for summary judgment on this issue. The same issue has been addressed by United States District Judge Norman K. Moon in actions filed by Wootten and Supinger. See Wootten v. Commonwealth, 154 F. Supp. 3d 322, 2016 U.S. Dist. LEXIS 1649 (W.D. Va. 2016); Supinger v. Commonwealth, No. 6:15-CV-00017, 2016 U.S. Dist. LEXIS 94308 (W.D. Va. July 20, 2016).

### a. The VGP and LEOPGA

As Judge Moon observed in the cases before him, "a review of Virginia's grievance procedures is necessary" to properly understand this particular claim. Supinger, 2016 U.S. Dist. LEXIS 94308, at *11 (quoting Wootten, 2016 U.S. Dist. LEXIS 1649, at *20). Under Virginia law, two grievance procedures are available to non-probationary law enforcement officers employed by the state. The first is the State Grievance Procedure ("VGP") set forth in §§ 2.2-3000 through 2.2-3008 of the Code of Virginia. The VGP provides that "[u]nless exempted by law, all nonprobationary state employees shall be covered by the grievance procedure established pursuant to this chapter and any regulations adopted pursuant thereto." Va. Code § 2.2-3001(A). If an employee chooses to grieve his dismissal under the VGP, the grievance "proceed[s] directly to a formal hearing." Va. Code § 2.2-3003(A). Notably, the VGP specifically states that its provisions "shall not apply to . . . [l]aw-enforcement officers . . . whose

---

[3] In his amended complaint, Stultz also alleged that he possessed liberty interests that were abridged without due process as a result of being denied the opportunity to refute the allegations against him and clear his name. Because it is undisputed that Stultz had a property interest in his continued employment that entitled him to a hearing, the court need not decide whether Stultz had any protected liberty interests. See Heins v. Beaumont Independent Sch. Dist., 525 F. Supp. 367, 371 (E.D. Tex. 1981) (declining to decide whether the plaintiff had any protected liberty interests in light of the court's finding that the plaintiff had "a property interest in her employment sufficient to accord the right of a hearing," and emphasizing that "[t]he plaintiff was entitled to a hearing to protect any interests that she had whether they are classified as liberty or property"); see also Harrell v. City of Gastonia, 392 F. App'x 197, 203 (4th Cir. 2010) ("If the public employee can establish a protected liberty interest . . . , the employee is entitled to due process, which in this context involves a 'name-clearing hearing.'").

grievances are subject to [the provisions of the LEOPGA] and who have elected to resolve such grievances under those provisions." Va. Code § 2.2-3002.

The second statutory grievance procedure is the one set forth in the LEOPGA. See Va. Code §§ 9.1-500 to 9.1-507. The LEOPGA provides that "[w]henever a law-enforcement officer is dismissed, demoted, suspended or transferred for punitive reasons, he may, within a reasonable amount of time following such action, as set by the agency, request a hearing." Va. Code § 9.1-504(A). At the hearing, the officer and his agency "shall be afforded the opportunity to present evidence, examine and cross-examine witnesses." Id. Consistent with the VGP, the LEOPGA provides that a grievant "may proceed under either" the LEOPGA or another grievance procedure, "but not both." Va. Code § 9.1-502(B).

In this case, Stultz, like Wootten and Supinger, clearly and unequivocally elected to pursue a termination grievance under the LEOPGA. Based on a plain reading of the applicable state statutes, the court agrees with Judge Moon that the plaintiff's election to proceed under the LEOPGA "foreclosed, as a matter of law, his ability to proceed under the VGP." Supinger, 2016 U.S. Dist. LEXIS 94308, at *12. Consequently, because defendants refused to allow Stultz to proceed under the LEOPGA, "they 'refused to provide Plaintiff with the only process available to [him].'" Id. (quoting Wootten, 2016 U.S. Dist. LEXIS 1649, at *22).

### b.   Stultz adequately availed himself of post-termination remedies

In response to Stultz's motion, defendants correctly point out that, in order "[t]o state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." Root v. County of Fairfax, 371 F. App'x 432, 434 (4th Cir. 2010) (quoting Alvin v. Suzuki, 227 F.3d

26

107, 116 (3d Cir. 2000)). The problem with this argument is that the undisputed facts show that Stultz repeatedly attempted to take advantage of the processes that were "available" to him. Id.

It is undisputed that Stultz wrote to the DMV on October 25, 2013 and advised of his intent to pursue a termination grievance under the LEOPGA. Likewise, on November 1, 2013, Stultz reiterated his request to proceed under the LEOPGA. The defendants concede that Stultz's requests were denied. The defendants argue, however, that Stultz was offered the opportunity to proceed under the VGP following his October 25, 2013 letter, and that because he did not accept the offer, he did not take advantage of the processes that were available to him.

> The court agrees with Judge Moon that the defendants' argument is without merit.
>
> First, it contradicts the clear, unambiguous language of the VGP and LEOPGA, which provide that an election to proceed under one forecloses the grievant's ability to proceed under the other.
>
> Second, . . . none of Defendants' cited authority indicates that Grab [or DMV] has the authority to rewrite or suspend unambiguous provisions of the VGP or LEOPGA.
>
> Third and finally, Defendants' position ignores Grab's May 6, 2014 letter. When [the plaintiff's] counsel explicitly and directly informed Grab that he had elected to proceed under LEOPGA on October 25, 2013, Grab acknowledged that [the plaintiff] was therefore "no longer able to pursue a dismissal grievance under VGP." Grab's May 6 letter indicates plainly that he believed an election under LEOPGA prevented [the plaintiff] from proceeding under VGP.

Supinger, 2016 U.S. Dist. LEXIS 94308, at *15. Accordingly, the defendants' contention that the VGP remained open to Stultz "is, at best, 'merely colorable' as a factual matter, and flatly wrong as a matter of law." Id. (quoting Anderson, 477 U.S. at 250).

As in Supinger and Wootten, the undisputed facts in this case are that Stultz attempted to grieve his termination under the only process that was, as a matter of law, available to him after he elected to proceed under the LEOPGA on October 25, 2013. Once Stultz made that election, the

27

VGP was unavailable pursuant to Va. Code § 2.2-3002, "and accordingly he did not have to attempt to grieve under that statute." Supinger, 2016 U.S. Dist. LEXIS 94308, at *16. Thus, contrary to the defendants' assertions, it is clear from the record that Stultz "t[ook] advantage of the processes that [were] available to him," and that those processes were denied. Root, 371 F. App'x at 434; see also Wootten, 2016 U.S. Dist. LEXIS 1649, at *26 ("[F]ar from failing to take advantage of the processes that are available, Plaintiff made every effort to participate in Virginia's two-track system for grieving terminations: She repeatedly elected – as the Virginia General Assembly granted her the right to do – for a hearing under LEOPGA. Defendants refused to give it to her.") (citation and internal quotation marks omitted).

### c.     Defendants' involvement in the deprivation

"In order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)). When the constitutional violation at issue is termination without sufficient process, the plaintiff must prove that the named defendants "singly or in combination caused or contributed to [the] denial of [the plaintiff's] property rights without due process of law." Garraghty v. Virginia, Dep't of Corrections, 52 F.3d 1274, 1280 (4th Cir. 1995).

In this case, Stultz claims that Holcomb, Hill, Thorpe, and Penny caused the deprivation of his right to due process. See Docket No. 152 at 55; Docket No. 487 at 10.[4]  It is undisputed that

---

[4] In the initial brief filed in support of his motion for summary judgment, Stultz referred to Howard in a section heading, even though Howard was not named as a defendant to this particular claim in the amended complaint. See Docket No. 454 at 37 ("Defendants Holcomb, Hill, Penny, Thorpe, and Howard, acting under color of state law, caused the deprivation of these federal rights . . . ."). Stultz corrected this mistake in his reply brief. See Docket No. 487 at 10 ("Richard Holcomb, Jeannie Thorpe, Joseph Hill, and Thomas Penny caused the violation of Stultz's due process rights.").

28

Holcomb issued the letter denying Stultz's request for a grievance hearing under the LEOPGA, and that Thorpe and Hill were also involved in the decision to deny his request. See Docket No. 454-58 at 8-9 (Thorpe Dep.) (confirming that Thorpe, Hill, and Holcomb were "involved in the decision to deny Mr. Stultz a hearing under the LEOPGA"). It is therefore undisputed that Holcomb, Thorpe, and Hill "singly or in combination caused or contributed to [the] denial of [plaintiff's] property rights without due process of law." Garraghty, 52 F.3d at 1280; see also Supinger, 2016 U.S. Dist. LEXIS 94308, at *16-17 (holding that there were "no undisputed facts as to causation with regard to Holcomb, Thorpe, and Hill," since it was undisputed "that Holcomb issued the letter denying Supinger due process, and that Thorpe and Hill participated in deciding whether to afford Supinger a LEOPGA hearing.").

The same cannot be said, however, for Penny. There is no evidence that Penny was involved in the decision to deny Stultz's request for a hearing under the LEOPGA. Instead, the evidence cited by Stultz merely indicates that Penny advised Stultz, during an investigative interview, of his statutory "right to initiate a grievance under either the [VGP] or the [LEOPGA], but not both" if the investigation resulted in dismissal, Docket No. 466-40 at 5, and that Penny was later notified that Stultz had elected to request a hearing under the LEOPGA. See Docket No. 487-10 at 7. In the absence of any evidence that Penny played any role in deciding whether to afford such hearing, the court concludes that Penny is entitled to summary judgment on this claim. See Garraghty, 52 F.3d at 1280 (holding that defendants who participated in the investigation that resulted in the plaintiff's termination were entitled to summary judgment on the plaintiff's due process claim, since there was "no evidence that any acts [by the defendants] caused [the plaintiff] to be denied due process").

29

### d. Qualified immunity

Having determined that Holcomb, Thorpe, and Hill were personally involved in the denial of plaintiff's right to due process, the court must determine whether they are shielded from liability for damages in their individual capacities under the doctrine of qualified immunity. "Qualified immunity protects [officials] who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." Meyers v. Baltimore County, 713 F.3d 723, 731 (4th Cir. 2013). To prevail under this defense, the defendants "must show either that no constitutional violation occurred or that the right violated was not clearly established at the time it was violated." Hunter v. Town of Mocksville, 789 F.3d 389, 396 (4th Cir. 2015).

Here, the court has already determined that Stultz was deprived of his right to due process. Accordingly, the court must decide whether the defendants have met their burden of proving that the right at issue was not clearly established. For the following reasons, the court concludes that the defendants have failed to meet that burden.

The Supreme Court has held that the Constitution requires that a non-probationary public employee receive "a very limited hearing prior to his termination, . . . followed by a more comprehensive post-termination hearing." Gilbert v. Homar, 520 U.S. 924, 929 (1997) (citing Loudermill, 470 U.S. at 544-546). Likewise, the Fourth Circuit has made clear that terminated state employees are entitled to post-termination process. See Garraghty, 52 F.3d at 1283 (citing Holland v. Rimmer, 25 F.3d 1251, 1258 (4th Cir. 1994); Linton v. Frederick County Bd. of County

30

Com'rs, 964 F.2d 1436, 1441 (4th Cir. 1992); McClelland v. Massinga, 786 F.2d 1205, 1213 (4th Cir. 1986)).

As explained above, Stultz was entitled to grieve his termination under the VGP or the LEOPGA, but not both. Stultz elected to proceed under the LEOPGA, thereby foreclosing his ability to grieve his termination under the VGP, and the defendants repeatedly denied his request for hearing under the LEOPGA. See Va. Code § 2.2-3002 (the provisions of the VGP "shall not apply" to law enforcement officers "who have elected to resolve such grievances under [the LEOPGA]").

The defendants argue, as they did in Supinger and Wootten, that they are entitled to qualified immunity because no court had held that electing to proceed under the LEOGPA automatically precludes a grievant from proceeding under the VGP. See Docket No. 465 at 17 (noting that no court had applied the "strict interpretation" of the statutes advocated by Stultz). However, "[t]o ring the 'clearly established' bell, there need not exist a case on all fours with the facts at hand." Hunter, 789 F.3d at 401. "In other words, 'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity.'" Id. (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999). Instead, "the unlawfulness must be apparent in light of pre-existing law." Trulock v. Freeh, 275 F.3d 391, 400 (4th Cir. 2001).

Here, the court agrees with Judge Moon that the VGP and LEOPGA "are unambiguously mutually exclusive," Supinger, 2016 U.S. Dist. LEXIS 94308, at *17, and that "the absence of a judicial decision holding that [due process is violated] under similar circumstances" does not prevent the court from denying the qualified immunity defense. Wootten, 2016 U.S. Dist. LEXIS

31

1649, at *32 (quoting Meyers, 713 F.3d at 734). It is clear from existing precedent that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Meyers, 713 F.3d at 734. The mere fact that Holcomb, Hill, and Thorpe "may have misread the plain text of the VGP and LEOPGA does not entitle them to qualified immunity." Supinger, 2016 U.S. Dist. LEXIS 94308, at *18.

For these reasons, the parties' motions for summary judgment on the post-termination procedural due process claim will be granted in part and denied in part.

## 2.  **Withholding of evidence**

Stultz next contends that Howard and Hill violated his due process rights during the VEC proceedings by failing to produce certain exculpatory evidence, specifically an email from Boswell expressing his approval of Stultz's Extraordinary Contributor rating for Supinger. Stultz eventually obtained the email via alternate means, and prevailed on appeal from the initial denial of unemployment benefits. Relying on Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, Stultz argues that "when the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." Illinois v. Fisher, 540 U.S. 544, 547 (2004) (citing Brady, supra).

The problem with Stultz's argument is that the Brady disclosure rule is "a rule of criminal law," Perez v. Wallis, 77 F. Supp. 3d 730, 747 (N.D. Ill. 2014), and the Supreme Court has "never stated that the Brady rule applies in civil cases." Demjanjuk v. Petrovsky, 10 F.3d 338, 353 (6th Cir. 1993). Moreover, in cases such as this, where what was at stake in the underlying proceeding was "money and reputation, not whether someone [would] be locked away," courts, including the Fourth Circuit, have uniformly held that Brady is inapplicable. United States v. Project on

32

Government Oversight, 839 F. Supp. 2d 330, 343 (D.D.C. 2012) (collecting cases); see also Nat'l Labor Relations Bd. v. Nueva Eng'g, Inc., 761 F.2d 961, 969 (4th Cir. 1985) (holding that the Brady rule is inapplicable to proceedings under the National Labor Relations Act, since the Act "is civil in nature, does not involve potential incarceration and violation of the Act does not carry with it the stigma of a criminal conviction"); Brodie v. Dep't of Health and Human Servs., 951 F. Supp. 2d 108, (D.D.C. 2013) (holding that the Brady rule is inapplicable to administrative debarment proceedings, and emphasizing that "Brady does not apply in civil cases except in rare situations, such as when a person's liberty is at stake"); Tanyi v. Appalachian State Univ., No. 5:14-CV-170RLV, 2015 U.S. Dist. LEXIS 95577, at *14 (W.D.N.C. July 22, 2015) (dismissing plaintiff's claim under Brady and noting that the court was "aware of no Fourth Circuit case law extending the rule to civil matters, much less student disciplinary proceedings"). Consistent with the foregoing decisions, the court finds plaintiff's reliance on Brady unavailing and will grant the defendants' motion for summary judgment with respect to this claim.

### 3.    Witness intimidation

In his final due process claim, Stultz alleges that Holcomb, Hill, Thorpe, Penny, and Howard denied him due process by intimidating prospective witnesses. See Detweiler v. Virginia Dep't of Rehabilitative Servs., 705 F.2d 557, 561-62 (4th Cir. 1983) (holding, in the context of a motion to dismiss, that the plaintiff's allegation that prospective favorable witnesses were intimidated stated a claim for deprivation of due process).

The defendants have moved for summary judgment on the claim of witness intimidation. In response to the motion, Stultz argues that Hill, Howard, and Penny coerced Andrew Hicks to change prior statements. However, Stultz fails to cite to any "particular parts of materials in the

33

record" to support this argument. Fed. R. Civ. P. 56(c)(1)(A). His assertion that Penny told Hicks that he was "hanging on to [his] job by the skin of [his] teeth and . . . then threatened Hicks with being sent home" is accompanied by no citation to any document in the record, nor is his assertion that Hicks "told several witnesses that he was throwing up in the bathroom after [a] 'run in' with Penny due to the stress the defendants placed him under in fear for his job." Docket No. 466 at 20. While Stultz goes on to argue that his witness intimidation claim is supported by Hicks' own inconsistent testimony, he does not cite to any particular portions of Hicks' testimony to support this argument. Instead, he invites the court to review over 800 pages of deposition and interview transcripts,[5] which the court declines to do. It is simply not the responsibility of the court to "comb the record in search of disputed facts." N.J. Carpenters Pension Fund v. Hous. Auth. & Urban Redevelopment Agency, 68 F. Supp. 3d 545, 549 (D.N.J. 2014). Instead, "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." Cross v. Home Depot, 390 F.3d 1283, 1290 (10th Cir. 2004) (citation and internal quotation marks omitted); see also Wimbush v. Wyeth, 619 F.3d 632, 639 n.4 (6th Cir. 2010) ("[I]t was [plaintiff's] job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting him to sort it out.")

For these reasons, the court concludes that Stultz has not shown that a material dispute of fact exists as to whether the named defendants intimidated a prospective witness. Accordingly, the court will grant the defendants' motion for summary judgment with respect to this claim.

---

[5] See Docket No. 466-1 at 3 n. 87 ("See Exhibit 58; See Exhibit 59; See Exhibit 60; See Exhibit 61; See Exhibit 62").

34

## B.     First amendment retaliation

In Count III of the amended complaint, Stultz asserts a claim of retaliation in violation of the First Amendment. Specifically, Stultz contends that he was terminated in retaliation for speaking out on matters of public concern.

### 1.     First Amendment violation

"The First Amendment protects not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right." Adams v. Trs. of the Univ. of N. Carolina-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)). While public employees "do not surrender all their First Amendment rights by reason of their employment," Garcetti v. Ceballos, 547 U.S. 410, 417 (2006), courts "evaluate the exercise of First Amendment rights by public employees differently from their exercise by other citizens." Durham v. Jones, 737 F.3d 291, 299 (4th Cir. 2013). Specifically, courts "must balance the interests of an employee who, as a citizen, comments upon matters of public concern, on the one hand, and the interests of a governmental employer, which must maintain an effective workplace, on the other." Id. (citing Connick v. Myers, 461 U.S. 138 (1983).

In McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998), the Fourth Circuit set forth a three-part test for determining whether a public employee has a cognizable claim for retaliatory discharge under the First Amendment. The McVey test requires the court to consider:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's protected speech was a substantial factor in the employee's termination decision.

35

McVey, 157 F.3d at 277-78.   The first two prongs present questions of law for the court to decide, while the third prong presents a question of fact that "can be decided 'on summary judgment only in those instances where there are no causal facts in dispute.'"   Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) (quoting Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 354 (2000)).

### a.      First prong of the McVey test

The first prong of the McVey test requires the court to consider whether Stultz spoke as a citizen upon a matter of public concern.   Both parties have moved for summary judgment on this threshold inquiry.   During the hearing on the parties' motions, Stultz narrowed the focus of this claim to his communications with McGowan and Connaughton regarding the FWA investigation, and his communications with Senator Deeds regarding DMV's decision to abandon the STARS division boundaries.[6]   For the reasons set forth below, the court concludes that the evidence pertaining to these particular communications, when viewed in the light most favorable to Stultz, indicates that he spoke as a citizen on a matter of public concern and, thus, that the defendants are not entitled to summary judgment on this issue.   However, because it cannot be said that there are no disputed facts regarding the nature of Stultz's speech, his cross-motion on this issue must also be denied.   See Andrew v. Clark, 561 F.3d 261, 271 (4th Cir. 2009) (holding that the district court, which improperly dismissed the plaintiff's First Amendment claim, did not also err in denying the

---

[6] Stultz abandoned his original assertion that he also engaged in protected speech when he complained to a state official about Dawson and the manner in which Stultz's supervisors had responded to her behavior in the workplace.   In any event, the court is of the opinion that such communications fall within the category of personal employee grievances related to conditions of employment, "which do not constitute speech about matters of public concern that are protected by the First Amendment."   Stroman v. Colleton Cty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992).

Case 7:13-cv-00589-GEC   Document 519   Filed 08/26/16   Page 36 of 57   Pageid#: 16590

plaintiff's motion for partial summary judgment, since there were "disputed facts regarding the nature of [the employee's] speech").

In determining whether an employee spoke as a citizen or as an employee, "the Supreme Court has instructed [lower courts] to engage in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those duties." Hunter, 789 F.3d at 397 (quoting Garcetti, 547 U.S. at 422, 424). In Garcetti, the Supreme Court expressly declined to focus on whether the speech related to the subject matter of the employee's employment. Garcetti, 547 U.S. at 420. The Court emphasized that "[t]he First Amendment protects some expressions related to the speaker's job," and ultimately found "nondispositive" the fact that the employee expressed his views on an issue related to his employment position. Id. at 420-21. More recently, in Lane v. Franks, 134 S. Ct. 2369 (2014), the Supreme Court reiterated that the "critical question under Garcetti" is "whether the speech at issue is itself within the scope of an employee's duties, not whether it merely concerns those duties." Lane, 134 S. Ct. at 2379.

Applying these principles, the court concludes that Stultz has adduced evidence sufficient to establish that he spoke as a citizen when he communicated with McGowan and Connaughton regarding the investigation of the FWA complaint, and when he communicated with Deeds regarding DMV's decision to abandon the STARS division boundaries. Stultz's evidence indicates that he communicated with these individuals on his own time, and that he used his personal phone, email account, and motor vehicle in doing so. Moreover, with respect to the "critical question under Garcetti," nothing in the record before the court indicates that his communications with McGowan, Connaughton, or Deeds fell within the scope of Stultz's ordinary

37

duties with DMV. In other words, there is no indication that Stultz was simply doing his job when he reached out to these individuals. Instead, the evidence viewed in the light most favorable to Stultz indicates that he acted as a private citizen. Moreover, the mere fact that Stultz's communications may have related to his job or involved information that he learned through his employment is nondispositive. See Lane v. Anderson, No. 15-2153, 2016 U.S. App. LEXIS 15107, at *13 (4th Cir. Aug. 17, 2016) ("Although Appellant's 'expressions related to [his] job,' the First Amendment affords him protection when he conveys these views as a private citizen.") (quoting Garcetti, 547 U.S. at 421)); see also Hunter, 789 F.3d at 396-97 (emphasizing that it is "antithetical to our jurisprudence to conclude that . . . speech by public employees regarding information learned through their employment . . . may never form the basis for a First Amendment retaliation claim").

The current record, viewed in the light most favorable to Stultz, also indicates that Stultz's communications regarding the FWA investigation and the STARS system pertained to matters of public concern. This inquiry turns on the "content, form and context" of the speech at issue. Connick, 461 U.S. at 147-48. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004). "This does not include 'personal complaints and grievances about conditions of employment.'" Durham, 737 F.3d at 300 (quoting Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir. 2007); see also Stroman v. Colleton Cty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992) ("Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are

38

protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee.").

In this case, the content of Stultz's communications regarding the FWA investigation and the STARS system indicates that he was speaking on matters of public concern as opposed to matters of mere personal interest. Turning first to the FWA investigation, Stultz reached out to McGowan and Connaughton after discovering that the safety concerns that he identified during an interview had been altered by DMV's internal auditors and omitted from their final report, and that the auditors had specifically found, without conducting any investigation, that there was "no evidence" that Dawson posed any risk of harm her co-workers. In communicating with McGowan and Connaugton, Stultz complained that the official investigation of an FWA complaint had been "fraudulent[ly]" manipulated by DMV's internal auditors, and that they had intentionally "sanitized" the information that they submitted to DSIA. It is well settled that speech that "seek[s] to bring to light actual or potential wrongdoing or breach of public trust" involves a matter of public concern, as do allegations of fraud and corruption within a government agency. Jurgenson v. Fairfax Co., Va., 745 F.2d 868, 879 (4th Cir. 1994) (quoting Connick, 461 U.S. at 148); see also Lane, 2016 U.S. App. LEXIS 15107, at *14 (holding that the content of an employee's speech, in which he "questioned an allegedly botched investigation, which he suspected was cloaked in a police cover-up" was "undeniably a matter of public concern"); Cutts v. Peed, 17 F. App'x 132, 135 (4th Cir. 2001) (noting that statements involving "purported fraud" in a law enforcement agency "indisputably do constitute matters of public concern"); Maciarello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992) (holding that "an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be interested"). While the

39

defendants argue that the concerns expressed by Stultz were "exaggerate[d]" and "distort[ed]," Docket No. 429 at 38, the court is compelled to view the evidence in the light most favorable to him in resolving the defendants' motion. When the evidence is viewed in that light, the court concludes that the content of Stultz's communications with McGowan and Connaughton pertained to a matter of public concern.

Stultz's communications with Senator Deeds likewise do not evince merely private grievances. Instead, the evidence presented by Stultz indicates that he detailed his concerns regarding the communication problems that could result from DMV's decision to abandon the STARS division boundaries, and the negative effects that those problems could have on the safety of DMV law enforcement officers and the public. Stultz also shared documents with Deeds that supported his concerns regarding the STARS system, including communications from Michael Bolton and Michael Deane of the Virginia State Police that addressed the relevant safety issues. See, e.g., Docket No. 466-33 at 33 (observing that "DMV agents may change zones as they travel across VSP division boundaries" and that "[t]his places them at risk if they fail to change zones and need emergency assistance"); Docket No. 466-33 at 37 (emphasizing that "the disparity in some STARS agenc[ies'] operational boundaries and the VSP field division boundaries" could "hinder the Virginia State Police's (VSP) ability to provide the best possible emergency response for STARS agencies with law enforcement responsibilities during a life threatening situation"). While DMV argues that Stultz relied on outdated information and overstated the potential risk of harm, Stultz's evidence indicates that the safety issues caused by DMV's decision to abandon the STARS division boundaries continued to exist at the time of his termination. Viewing the record in the light most favorable to Stultz, the court concludes that the content of his communications

40

with Senator Deeds implicated a matter of public concern. See Goldstein, 218 F.3d at 353 (explaining that statements "relating to public safety are quintessential matters of 'public concern'"); see also Shefcik v. Village of Calumet Park, 532 F. Supp. 2d 965, 977 (N.D. Ill. 2007) (observing that "if a police officer's safety is at issue, the police officer's ability to assist the needs of the community are also jeopardized").

Based on the current record, the court also concludes that the form of Stultz's communications supports the conclusion that they were on matters of public concern. Stultz reached out to the PBA regarding his concerns about fraud and corruption involving the state's FWA program, and McGowan assisted Stultz in communicating his concerns to the Secretary of Transportation. Along the same lines, Stultz voiced his safety-related concerns to a state legislator. Stultz, along with other concerned officers, met with Senator Deeds regarding DMV's decision to abandon the STARS division boundaries, and provided information to support their belief that the realignment could jeopardize the safety of officers and the public. Contrary to the defendants' argument, the fact that Stultz did not voice his concerns to the news media or the general public "does not, in any way, undermine the public concern encompassed in his speech." Goldstein, 218 F.3d at 354. Existing precedent makes clear that "[p]ublic employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly." Cromer v. Brown, 88 F.3d 1315, 1326 (4th Cir. 1996); see also Hunter, 789 F.3d at 402 (rejecting the defendants' argument that "exposing serious government misconduct to the news media is protected, but exposing the same misconduct to the Governor's Office . . . is not"). Accordingly, the form of the speech at issue does not "deprive[] it of its public import." Cromer, 88 F.3d at 1326.

41

Finally, the court must consider the context in which the speech took place. For their part, the defendants emphasize that Stultz's speech regarding the FWA investigation was made following a long period of discord in the workplace involving Dawson, whose conduct formed the basis of the FWA complaint, and that his speech regarding the STARS system was made after the DMV decided to realign his division and "break[ up] his core group of dissidents in Lynchburg/Appomattox." Docket No. 465 at 31. Stultz, however, disputes the defendants' assertions and insists that he acted with the good-faith belief that the FWA system had been fraudulently manipulated in a manner that precluded safety concerns from being adequately addressed, and with the desire to protect officers and the public from the safety risks that could result from the DMV's decision to deviate from the STARS division boundaries. Viewing the evidence in the light most favorable to Stultz, the court "simply cannot conclude that he had anything but a good-faith intent to identify safety [issues]" and bring to light actual or potential wrongdoing on the part of government officials. Goldstein, 218 F.33d at 354. When viewed in that manner, Stultz's communications relating to public safety and governmental misconduct, in the form and context in which they were made, involved matters of public concern.

### b. Second prong of the McVey test

The second prong of the McVey test requires the court to consider "whether the employee's interest in speaking upon a matter of public concern outweighed the government's interest in providing effective and efficient services to the public." McVey, 157 F.3d at 277-78. "Regarding this balancing, the government bears the 'burden of justifying the discharge on legitimate grounds.'" Smith v. Gilchrist, 749 F.3d at 308 (quoting Rankin v. McPherson, 483

42

U.S. 378, 388 (1987)). The balancing test requires the court to consider the context in which the speech was made and the extent to which the speech impaired the efficiency of the workplace. Id. The Fourth Circuit has recognized that "[t]he efficient functioning of government offices is a paramount public interest," and that law enforcement agencies "are the most restrictive in this regard as they are paramilitary – discipline is demanded, and freedom must be correspondingly denied." Durham, 737 F.3d at 301 (citation and internal quotation marks omitted). At the same time, "[a] stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it." McVey, 157 F.3d at 279 (Murnaghan, J., concurring).

Courts consider a number of factors in determining the extent to which an employee's protected speech disrupts the operation and mission of the agency. Durham, 737 F.3d at 301. Factors relevant to this inquiry include whether an employee's speech:

> (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

Ridpath, 447 F.3d at 317 (citing McVey, 157 F.3d at 278).

In this case, the defendants have presented no evidence of any actual disruption in the DMV resulting from Stultz's communications with the PBA, Secretary Connaughton, or Senator Deeds. To the contrary, when asked about certain communications, both Hill and Thorpe testified that they were unaware of any resulting disruption. While the defendants are "correct that 'concrete' evidence of an actual disruption is not required, there must still be a reasonable

43

apprehension of such a disruption." Durham, 737 F.3d at 302 (quoting Maciarello, 973 F.2d at 300).

In attempting to meet their burden, the defendants submitted, for the very first time with a reply brief, a declaration from Hill indicating that if he "had not determined that there was not substantial and convincing evidence warranting Mr. Stultz's termination, it is likely that [he] would have reviewed Stultz's speech outside the chain of command and its impact on the DMV Law Enforcement Division (LED) and [himself], as the chief law enforcement officer of the LED." Docket No. 484-1 at 34. The affidavit stresses the importance of "[o]rder, discipline, and respect . . . to the functioning of the LED." Id. Focusing primarily on Stultz's speech concerning the STARS system, Hill asserts that he "would have been reasonably concerned that the substance of Stultz's public allegations would cause distrust, dissension, disruption, and morale problems amongst [DMV's] sworn officers." Id. at 36.

Although the court recognizes that Hill's assertions were made under penalty of perjury, the court is unable to conclude, based on his declaration alone, that such interests outweighed Stultz's right to speak out on matters of public concern. The Fourth Circuit has made clear that more is required than "vague references" and "lip service to ostensible damage to office morale, relationships between colleagues, and the [general] function of the office." Durham, 737 F.3d at 302; see also Goldstein, 218 F.3d at 356 (concluding that the defendant's "generalized and unsubstantiated interests, although substantial," did not outweigh the plaintiff's interest in voicing safety complaints). The court has no reason to doubt that the DMV's Law Enforcement Division has a strong interest in maintaining order, discipline, and respect. However, "it is not enough that there is some disruption; the amount of disruption has to outweigh the importance of the speech

44

and its concern to the public." Durham, 737 F.3d 302. Viewing the record in the light most favorable to Stultz, the court cannot conclude that the hypothetical statements in Hill's declaration are sufficient to establish that DMV's interests outweighed Stultz's interests in voicing concerns regarding public safety and governmental misconduct. Accordingly, the defendants are not entitled to summary judgment on this element.

### c.     Third prong of the McVey test

Under the third prong of the McVey test, the court considers whether the employee's exercise of his First Amendment rights "was a 'substantial' or 'motivating' factor" in the employer's decision to determine his employment." Bland v. Roberts, 730 F.3d 368, 375 (4th Cir. 2013) (quoting Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993). As noted above, this factual issue "can be decided on 'summary judgment only in those instances where there are no causal facts in dispute.'" Love-Lane, 355 F.3d at 776 (quoting Goldstein, 218 F.3d 337, 352 (4th Cir. 2000)."

Viewing the record in the light most favorable to Stultz, the court concludes that the evidence raises a triable issue of fact as to whether Stultz's communications with the PBA, the Secretary of Transportation, and Senator Deeds were a motivating factor in the decision to terminate his employment. One of the Written Notices issued in support of Stultz's termination specifically referred to his email communications with McGowan and Connaughton. Moreover, Stultz was asked about his meeting with Senator Deeds prior to his suspension, and he was purportedly advised by Penny that "the situation was manageable until [Stultz] went outside the department to other government officials." Docket No. 454-1 at 23. While the defendants have cited a number of reasons for the termination apart from Stultz's protected speech, a reasonable

45

jury could find, based on all of the evidence presented, that the speech at issue was a motivating factor in the decision to terminate Stultz's employment. Accordingly, the third prong of the McVey test cannot be decided in the defendants' favor on summary judgment.

## 2.    Defendants' involvement in the violation

As explained above, "[i]n order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Wright, 766 F.2d at 850 (quoting Vinnedge 550 F.2d at 928). The Fourth Circuit has noted that, in the context of an unlawful termination, "causing [the] termination is sufficient to give rise to § 1983 liability." Garraghty, 52 F.3d at 1280; see also Wulf v. City of Wichita, 883 F.2d 842, 864 (10th Cir. 1989) (cited in Garraghty, supra) (holding that the "causal connection between [the defendant's] recommendation and Wulf's termination" was sufficient to hold the defendant personally liable for the First Amendment violation, even though the defendant did not have the authority to make the final employment decision); Conner v. Reinhard, 847 F.2d 384, 397 (7th Cir. 1988) (observing that "[t]he requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights.")

Stultz claims that Holcomb, Hill, Thorpe, Penny, Howard, and Anderson were personally involved in the violation of his First Amendment rights.[7] In moving for summary judgment on this issue, the defendants' sole argument is that Hill, who signed the Written Notices, was the "decisionmaker in terminating Stultz's employment," and that Penny, Thorpe, Howard, and

---

[7] Although Stultz's amended complaint included Boswell as a defendant to this claim, he makes no mention of Boswell in the arguments made in response to the defendants' motion. Accordingly, the claim against Boswell will be dismissed.

Anderson "cannot be held liable for any alleged First Amendment violation," since they "had no authority to terminate Stultz's employment." Docket No. 429 at 48-49. As the foregoing caselaw makes clear, however, personal liability for a First Amendment violation is not limited to individuals who have the authority to fire an employee. Instead, any official who "causes" the unlawful termination can also be held liable. Garraghty, 52 F.3d at 1280. Drawing all reasonable inferences in the light most favorable to Stultz, the court cannot say that Holcomb, Penny, Thorpe, Howard, and Anderson are entitled to summary judgment as a matter of law.

### 3. Qualified immunity

In their final argument, the defendants contend that even if Stultz's First Amendment rights were violated, those rights were not clearly established at the time of his termination in April of 2013. Accordingly, the defendants argue that Holcomb, Penny, Thorpe, Howard, and Anderson are entitled to qualified immunity. For the following reasons, the court is unable to agree.

As explained above, qualified immunity shields government officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry, 652 F.3d at 531. In determining whether a right is clearly established, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 534 (citation and internal quotation marks omitted).

In this case, the underlying right that the defendants allegedly violated – "that of a public employee to speak as a citizen on matters of public concern – is clearly established and something a reasonable person in the [defendants'] position should have known was protected." Adams, 640 F.3d at 566. Moreover, existing precedent makes clear that "[m]atters related to public safety are

47

quintessential matters of 'public concern,'" Goldstein, 218 F.3d at 353, and that "where public employees are speaking out on government misconduct, their speech warrants protection." Durham, 737 F.3d at 303 (citing Robinson v. Balog, 160 F.3d 183, 189 (4th Cir. 1998)).

The court recognizes that "not every situation involving a government employee speaking out about some workplace dispute qualifies" for protection. Id.; see also Brooks v. Arthur, 685 F.3d 367, 372 (4th Cir. 2012) ("[W]e have been wary of affording the broad cover of the First Amendment to comments limited to grievances about conditions of employment that cannot be considered matters of public concern.") (citation and internal quotation marks omitted). However, the situation here, according to the plaintiff's evidence, is not simply an "ordinary workplace dispute." Durham, 737 F.3d at 303. Instead, Stultz accused government employees of serious misconduct involving the intentional manipulation of an official investigation that compromised the integrity of the state's FWA program, and he complained about the effect that DMV's decision to abandon the STARS division boundaries could have on the safety of DMV law enforcement officers and the public. While various DMV policies may have required him to "refrain from openly criticizing agency policy or staff members," Docket No. 428-2 at 3, "[a]n independent basis for sanctions does not provide a shield from liability when the speech is constitutionally protected." Lane, 2016 U.S. App. LEXIS 15107, at *19 (citing Durham, 737 F.3d at 304); see also Am. Civil Liberties Union of Md., Inc. v. Wicomico Cty., 999 F.2d 780, 785 (4th Cir. 1993) (observing that "[r]etaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper").

48

The court is also constrained to conclude that the recent decision in Brickey v. Hall, No. 14-1910, 2016 U.S. App. LEXIS 12596 (4th Cir. July 8, 2016), in which the Fourth Circuit held that a police chief was entitled to qualified immunity on a First Amendment claim, does not compel a finding of qualified immunity in this case.[8]  In Brickey, a police officer who was running for an elected position on the town council made statements in two local newspapers which suggested that the police chief had misused $500 in the police department budget that was designated for the Drug Abuse Resistance Education ("D.A.R.E.") program.  2016 U.S. Dist. App. LEXIS 12596, at *3.  After commissioning an independent investigation into the officer's comments, the police chief terminated the officer.  Id. at *7, *15.

The court agrees with the plaintiff that there are a number of critical distinctions between Brickey and the instant case.  First, when viewed in his favor, Stultz's allegations about fraud, corruption, and risks to public safety are more serious than the allegation in Brickey that $500 in a police department's budget had not been used for its intended purpose.  Second, the allegations in Brickey were shown to be false.  During the independent investigation, "Brickey admitted [that] the D.A.R.E. funds were not missing, and [that] there were no improper charges to the account." Id. at *22.  Here, Stultz made no such concession.  Third, unlike Stultz, who communicated privately with McGowan, Secretary Connaughton, and Senator Deeds, Brickey's statements were communicated to the public in the local news media.  The Fourth Circuit emphasized that "the public nature of Brickey's comments increased their capacity for disruption."  Id. at *15. Finally, unlike the defendants, the police chief did more than "merely 'pa[y] lip service' to potential disruption to his police force."  Id. at *20.  Instead, he hired an out-of-state, former

---

[8] The parties were given the opportunity to file supplemental briefs addressing this decision.

49

police chief to conduct an independent investigation, and the former police chief concluded that the officer's statements "caused concern within the Saltville government and police department," and "were harmful to the public trust" of the police chief and "his integrity." Id. at *6, *15.

Based on these key distinctions, Brickey does not compel a finding of qualified immunity in this case. Instead, viewing the evidence in the light most favorable to Stultz, the court concludes that a reasonable official would have known that Stultz's private communications with the PBA, Secretary Connaughton, and Senator Deeds regarding governmental misconduct and public safety concerns were entitled to protection under the First Amendment. Accordingly, at this stage of the proceedings, the defendants' claim of qualified immunity must be denied.

For all of these reasons, the defendants' motion for summary judgment will be denied as to the claim of retaliatory discharge under the First Amendment against Holcomb, Hill, Thorpe, Penny, Howard, and Anderson

## C. Supervisory liability

In Count IV of the amended complaint, Stultz asserts a claim for supervisory liability under § 1983. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth the standard for supervisory liability). In moving for summary judgment on this claim, the defendants argue that "Count IV appears redundant of previous counts," and that if "the Court dismiss[es] Counts I and III, the two constitutional counts, Count IV [will] fail as well because the supervisor's 'inaction' caused no constitutional injury." Docket No. 429 at 44-45. In light of the court's rulings on the post-termination procedural due process claim asserted in Count I and the First Amendment claim asserted in Count III, this argument is without merit. Accordingly, the defendants' motion will be denied as to Count IV.

50

## II.    Claim under Title VII

In Count II of the amended complaint, Stultz asserts a claim of retaliation under Title VII. In addition to prohibiting discrimination on the basis of race, color, religion, sex, or national origin, Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the statute.    See 42 U.S.C. § 2000e-3(a).    When there is no direct evidence of retaliation, a plaintiff may proceed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1983).    See Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004).    This framework requires the plaintiff to initially establish the following elements by a preponderance of the evidence: (1) that he engaged in a statutorily protected activity; (2) that he suffered an adverse action; and (3) that a causal connection existed between the protected activity and the adverse action.[9]    EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005). For the following reasons, the court concludes that Stultz has failed to provide sufficient evidence to establish the first or third element.

The first element of the prima facie case requires the plaintiff to prove that he engaged in an activity protected by Title VII.    The retaliation provisions of Title VII include both an opposition clause and a participation clause.    Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999).    The opposition clause makes it unlawful for an employer to retaliate against an individual because he "opposed any practice" made unlawful by Title VII, while the participation clause make it unlawful to retaliate against an individual because he "made a charge,

---

[9]    When a plaintiff establishes the foregoing elements, the burden shifts to the employer to articulate a legitimate, nonretaliatiory reason for its purportedly retaliatory action.    Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 250 (4th Cir. 2015).    If the employer makes this showing, the burden shifts back to the plaintiff to demonstrate "that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination."    Id. (citation and internal quotation marks omitted).

51

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Id. (quoting 42 U.S.C. § 2000e-3(a)). For purposes of the opposition clause, "an employee is protected when [he] opposes . . . employment actions actually unlawful under Title VII" or "employment actions [he] reasonably believes to be unlawful." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (quoting Navy Fed., 424 F.3d at 406). "To qualify as opposition activity an employee need not engage in the formal process of adjudicating a discrimination claim. Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). For purposes of the participation clause, "[a]ctivities that constitute participation are [those] outlined in the statute: (1) making a charge; (2) testifying; (3) assisting, or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." Id.

In his brief in opposition to the defendants' motion for summary judgment, Stultz contends that Supinger was transferred to Waynesboro "on the bases of race and/or national origin, not nepotism as claimed," and that he opposed the transfer "from the beginning." Docket No. 466 at 21. However, Stultz cites no evidence from which a reasonable jury could find that he opposed Supinger's reassignment on the basis that it was discriminatory. As the "first step respondent" to a grievance filed by Supinger on April 14, 2012, Stultz did find, "[b]ased on the facts available," that it was "reasonable to be in agreement with [Supinger's] concerns and the sequence of events presented in [Supinger's] grievance." Docket No. 484-1 at 26. That grievance, however, made no mention of any Title VII concerns. The court agrees with the defendants that Stultz's neutral

52

reason for supporting the grievance did not "bring attention to an employer's discriminatory activities." Laughlin, 149 F.3d at 259; see also DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) (explaining that oppositional conduct occurs "when an employer communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination"). While Stultz also argues that he "expressed his opposition to the discriminatory transfer at the Farmville meeting" on September 28, 2012, he does not cite to any particular portion of the meeting transcript to support this argument. Docket No. 466 at 22 (emphasis added). The court's own review of the transcript discloses no evidence suggesting that he could. While Stultz may have expressed disagreement with the transfer decision, he did not communicate the belief that the decision was based on race or national origin.

To the extent Stultz also argues, in a conclusory fashion, that he "participated" in Supinger's EEOC proceedings, Docket No. 466 at 22, he has failed to proffer any evidence to support this argument. He has provided no dates, no description of his involvement in the proceedings, or any other evidence from which a reasonable jury could find that Stultz "utilize[d] the tools provided by Congress to protect [employees'] rights." Vasconcelos v. Meese, 907 F.2d 111, 113 (9th Cir. 1990).

Additionally, even assuming that Stultz did engage in a protected activity, he has failed to provide sufficient evidence of a causal link between the claimed protected activity and his March 2013 suspension or his April 2013 termination. In response to the defendants' motion, Stultz cites to evidence indicating that certain DMV officials were aware that Stultz "opposed" the decision to transfer Supinger to Waynesboro. See Docket No. 466-69 at 2 (Thorpe Dep.) (confirming that Stultz "oppose[d] this new work assignment making Mr. Supinger go to . . .

53

Waynesboro . . . [f]rom the very beginning"); Docket No. 466-73 at 4 (Anderson Dep.) (indicating that he was aware that Stultz "oppos[ed]" the transfer). Such knowledge, however, is insufficient to establish the requisite causal connection. Price, 380 F.3d at 213. While the causation element can be satisfied by the temporal proximity between a protected activity and an adverse action, the record in this case is devoid of evidence sufficient to establish a causal connection on the basis of temporal proximity alone. See Pascual v. Lowe's Home Centers, Inc., 193 F. App'x 229, 233 (4th Cir. 2006) (holding that a time period of three to four months separating the termination of the plaintiff's employment and the claimed protected activities was "too long to establish a causal connection by temporal proximity alone"). In the absence of any other evidence demonstrating that Stultz's termination was causally connected to activity protected by Title VII, his retaliation claim also fails at the third element.[10]

For these reasons, the court concludes that Stultz has failed to establish a prima facie case of retaliation. Accordingly, the defendants' motion for summary judgment will be granted with respect to this claim.

### III. Claim for tortious interference with contract expectancy

In Count VI of the amended complaint, Stultz asserts a claim for tortious interference with contract expectancy against Holcomb, Hill, Thorpe, and Penny. The defendants have moved for summary judgment on this claim. In response to the motion, Stultz argues that there is sufficient

---

[10] Stultz alleges that Penny and Howard inquired about his involvement in Supinger's "EEOC charge" during an investigative interview on February 7, 2013. Docket No. 466 at 22. He does not cite to a particular page of the interview transcript to support this assertion. Moreover, a review of the transcript reveals no mention of Supinger's EEOC charge. Instead, Howard inquired as to whether Stultz, as Supinger's supervisor, had responded to a grievance regarding Supinger's transfer and recommended that the reassignment plan be changed to suit Supinger. The court is convinced that such evidence is insufficient to establish that Stultz engaged in activity protected by Title VII or that he was terminated because of such activity.

54

evidence from which a reasonable jury could find that "Thorpe intentionally interfered with [his] job expectancy at the Bedford County Sheriff's Office" by sending Bedford County the Written Notices containing false and defamatory information relating to Stultz's employment. Docket No. 466 at 42.[11]

To prevail on this claim, Stultz must prove: (1) that he had a contract expectancy; (2) that the defendant knew of the expectancy; (3) that the defendant intentionally interfered with the expectancy; (4) that the defendant used improper means to interfere with the expectancy; and (5) that the plaintiff suffered a loss as a result of the defendant's disruption of the contract expectancy. Preferred Sys. Solutions, Inc. v. GP Consulting, LLC, 732 S.E.2d 676, 688 (Va. 2012). Improper means used to interfere with a contract expectancy "may include . . . misrepresentation or deceit, [or] defamation . . . ." Duggin v. Adams, 360 S.E.2d 832, 836 (Va. 1987).

In moving for summary judgment on this claim, the defendants first argue that Thorpe is immune from liability under Virginia Code §§ 15.2-1709 and 8.01-46.1. Section 15.2-1709 provides that the "director" of any agency "employing . . . law-enforcement officers . . . who discloses information about a former . . . officer's performance to a prospective law-enforcement or jail employer . . . is presumed to be acting in good faith and, unless lack of good faith is shown by clear and convincing evidence, is immune from civil liability for such disclosure or its consequences." Va. Code § 15.2-1709. The "presumption of good faith" afforded by the statute may be "rebutted upon a showing that the information disclosed by the former employer was

---

[11] Stultz does not reference Holcomb, Hill, or Penny in the applicable section of his brief in opposition to the defendants' motion for summary judgment, much less explain how they were responsible for interfering with his conditional offer of employment from Bedford County. Accordingly, the court will grant the defendants' motion for summary judgment as to the tortious interference claim asserted against these three defendants.

55

Case 7:13-cv-00589-GEC Document 519 Filed 08/26/16 Page 55 of 57 Pageid#: 16609

knowingly false or deliberately misleading, was rendered with malicious purpose, or violated any civil right of the former employee or appointee." Id. Section 8.01-46.1 similarly states that "[a]ny employer who, upon request by a person's prospective . . . employer, furnishes information about that person's professional conduct [or] reasons for separation . . . shall be immune from civil liability provided that the employer is not acting in bad faith." Va. Code § 8.01-46.1. The statute further provides that an employer "shall be presumed to be acting in good faith," and that such presumption "shall be rebutted if it is shown by clear and convincing evidence that the employer disclosed such information with knowledge that it was false, or with reckless disregard for whether it is false or not, or with the intent to deliberately mislead." Id.

Applying these standards, the court concludes that a reasonable jury could find that Thorpe knew that the Written Notices contained false information at the time they were disclosed to Bedford County. For instance, one of the Written Notices alleged that "[d]espite being told by the reviewer that an Extraordinary Contributor rating was unwarranted, [Stultz] disregarded [his] supervisor's instructions, and showed ASAC Supinger that [Stultz] intended to give him an . . . Extraordinary Contributor rating." Docket No. 459-6 at 15. According to plaintiff's evidence, at the time Thorpe forwarded the Written Notices to Bedford County, Thorpe knew that Stultz had established during his VEC proceedings that the allegation was false, and that Stultz had produced an email from Boswell expressing approval of the Extraordinary Contributor rating. Although Stultz's counsel specifically asked that DMV officials only share information with Bedford County that "they believe is true and accurate and can ultimately be supported by them," Docket No. 177-19 at 2, Thorpe nonetheless forwarded all three Written Notices to Bedford County, including the Written Notice that contained the false information. Moreover, the record reveals

56

that the false information was not without import and consequence. Indeed, a Bedford County officer involved in the hiring decision expressly indicated that Stultz was "out" upon receiving the information at issue. Docket No. 466-112 at 3. Viewing the record in the light most favorable to Stultz, the court concludes that the evidence raises a triable issue of fact as to whether Thorpe acted in good faith.

The defendants alternatively argue that Stultz is unable to prove that Thorpe used improper means or methods to interfere with his job expectancy. As noted above, such means or methods may include "misrepresentation or deceit." Duggin, 360 S.E.2d at 836. If a jury finds that Thorpe shared allegations with Bedford County that she knew were false, the jury may also find that she used improper methods to interfere with Stultz's efforts to obtain the job for which he applied. See, e.g., Amr v. Moore, No. 3:09CV667, 2010 U.S. Dist. LEXIS 79953, at *26 (E.D. Va. June 21, 2010) ("If true, a false allegation that Amr had plagiarized an academic paper may constitute misrepresentation or deceit sufficient to allege interference through improper means."). Accordingly, the defendants' motion for summary judgment will be denied with respect to the tortious interference claim against Thorpe.

### Conclusion

For the reasons stated, Stultz's motion for partial summary judgment will be granted in part and denied in part, and the defendants' motion for summary judgment will be granted in part and denied in part. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 25ᵗʰ day of August, 2016.

_____
Chief United States District Judge

57